Mr. Ratner, Ms. Ratner. Mr. Chief Justice, and may it please the Court, if you read the Helms-Burton Act from front to back, you'll have one clear takeaway, and it's the one I already mentioned this morning, that the 1996 Congress wanted to put crushing diplomatic and political pressure on the U.S. government   and economic pressure on the Cuban government. That includes by abrogating the sovereign immunity of Cuban instrumentalities in claims brought under Title III of that Act. Now, there's admittedly a high bar for abrogation, but this Court has said again and again that Congress doesn't need to use magic words to get there. It just needs to make its intent clear through what Kurtz called the sum total of its work, and it did that here. Let me start with the most important piece, Section 6082A. Congress created a cause of action and expressly applied that cause of action to foreign instrumentalities. That's a standard route to abrogation that this Court has recognized in Kurtz, Kimmel, Hibbs, and Financial Oversight and Management Board. Then Congress did three things to confirm that that was its intent. First, we know with absolute certainty that it wanted claims and judgments against Cuban instrumentalities because it repeatedly discusses them, including at 6082A7, C2, and D. That was up for debate in Kimmel and Kurtz. It's not up for debate here. Second, Congress emphasized that it wanted fully effective remedies in U.S. courts, including against governments. That's 60818 and 11. And third, at the same time it authorized suits against Cuban instrumentalities, Congress also codified an incredibly restrictive embargo cutting off commerce between the United States and Cuba. That combination makes no sense if Congress had intended to rely on FSIA exceptions that depend on commercial activity. I welcome the Court's questions. Are we to treat the assertion of sovereignty the same here as we did in Kurtz? Well, Justice Summers, to the extent you mean is there a different test for foreign sovereigns or other kinds of sovereigns, we have not argued for a lower test. I think arguably the sovereign immunity asserted in suits involving states and the federal government may be on even stronger footing than the sovereign immunity of foreign governments, because when it comes to foreign governments that's entirely a matter of comedy and grace. But our point is simply that foreign governments shouldn't be better off than all of the other types of sovereigns, states, the federal government, Indian tribes, and territories in the case that... In your argument, what would the interaction of Title III and the FSIA look like? So there are effectively two ways to harmonize those two statutes here. One is the way that we're advancing, which is the FSIA is a general rule, and the Helms-Burton Act is an additional specific abrogation. The other way of harmonizing is what respondents have said, which is the Helms-Burton Act provides the cause of action and the FSIA provides any abrogation of immunity. And our point is simply it is not plausible to believe that Congress intended the latter rather than the former, and we know that for several reasons. I think the fact that it simultaneously enacted the embargo is a pretty glaring one. The court often says Congress doesn't enact meaningless statutes, and the notion that it would circulate these claims over to a separate immunity regime that depends on commercial activity with the United States while simultaneously banning commercial activity with the United States is a pretty glaring neon sign. Could we stop at your first point? Because what you're arguing is that the statute here would impliantly reverse FISA's application, correct? No, Justice Sotomayor, I don't think that's right. I think we've reached the level of clarity necessary for that, but that's not how the court talks. Well, let's go to that. We do know that in Kurtz there was no statute. It was just how to read this statute, correct? That statute in conjunction with background principles. Background principles, but not another statute. The idea of irreconcilable conflict was present in Kurtz itself, and the court explained that if Congress enacts a cause of action against a governmental agency, and there is no way to bring that claim, those were Kurtz's words, against any government agency, then the cause of action itself must abrogate sovereign immunity. That's not the case here. In fact, you've brought a case, a claim that still survives against CMEX, and as I'm reading the record, there's been so much investment in Cuba, even before the current president. CMEX itself operates Western Unions on confiscated property. There's over 100 companies since 2001 that have exported products to Cuba. There's ongoing agricultural and other exports. So this isn't a dead letter if we impose sovereign immunity principles here. That's very different than Kurtz, isn't it? Justice Sotomayor, let me say a couple of things about that. First is, we don't know if it's a dead letter. Nobody has actually successfully made a claim through yet. Our claim, after seven years with one of the largest and most diverse claims, has not yet made it through. But more importantly, I don't think Kurtz says you need to have a dead letter. What Kurtz says is, if Congress defines a claim, specifically applies it against a government entity, and applying immunity in that circumstance would negate claims Congress wanted, then we think that's a pretty good sign that that statute itself outweighs immunity. You're going in a circle council. You're trying to read an intent into Congress by saying they wanted a bigger claim than the one I could have. But if a claim is still possible, what that means is that the two statutes, FISA and Title III, can be read harmoniously. Which is our charge, not to implicate repeal. Justice Sotomayor, let me address the Kurtz point, and I do want to go back to why this is not an implied repeal. On Kurtz, again, I think it is unequivocal that this would effectively negate many, maybe most, maybe all of the claims that Congress authorized. Kurtz did not rest on the notion that 100 percent of the claims could never come through. Well, I think it sort of did, Ms. Ratner. I mean, in Kurtz, in FMOMB, it was just true that if read one way, there was going to be a cause of action without any ability to bring the suit. And that was what, in all those cases, seemed absurd. Why would there be a cause of action if there's no way to bring a suit? You give with one hand, you take away with the other. But in this case, it's not for the reason that Justice Sotomayor suggested. The FSIA is this background law, and it's trans-substantive. It assumes that there are going to be other causes of action all around, but that it is the thing that it tells you, for purposes of all those causes of action, when are you immune and when are you not immune? And here, the FSIA sets up a series of tests. When you're immune, when you're not immune. And so why shouldn't we just take that as, like, okay, it's the FSIA that is the relevant statute here. The fact that there's causes of action, of course there's a cause of action in Article 3, as well as in many other statutes, but we don't take that to be, we don't look to those causes of action for purposes of deciding jurisdictional immunity for foreign agencies. So, Justice Kagan, let me try to unpack two things from there. First, I don't want to give up on the Kurtz point, because I do think in Kimmel it was not 100% superfluous. The state defendants came in and argued there are state statutory waiver schemes, so the existence of a cause of action will not negate all claims against states. This court rejected that out of hand. That's page 75 of Kimmel, on which Kurtz was based. But moving to the FSIA, the notion that the FSIA is sort of a comprehensive scheme here and something, Justice Sotomayor, that you'd have to impliedly repeal, I think is inconsistent with the court's 2009 decision in Beatty. And there, this is involving the particular terrorism provisions as they relate to the Republic of Iraq. And there the situation was reversed. It was Congress allowing the president to remove a waiver of sovereign immunity. But the court there said this is a specific, targeted rule at a moment in time and a particular actor, and it doesn't need to reference the FSIA. So I guess that seems right, that there could be statutes which don't need... You know, if this statute gave you a cause of action and gave you jurisdiction under 1331, which it might, and which also said, you know, there's an abrogation of immunity, then I am totally with you. It doesn't matter that the FSIA exists. But in fact, this statute does not do the last thing. So in that world, it seems as though, you know, Congress knows that there's an FSIA around, which provides the jurisdictional immunity rules. And so if Congress doesn't substitute in another statute, which does create a cause of action, it seems to me the right way to read what it's doing is to say we're providing a cause of action subject to the rules we know exist about jurisdictional immunity. Justice Kagan, I think there are two problems with that. One is doctrinal and one is statutory. The doctrinal problem is that just gets us back to a magic words requirement that the court has refused to apply. No magic words. They can abrogate immunity in any words they want to, but they have to abrogate immunity to replace the FSIA. And that is exactly the question here. Has Congress clearly abrogated immunity here? And we think through the sum total of its work, the answer is yes. But a cause of action doesn't abrogate immunity. It just doesn't. There are causes of action all over the place that rely on the FSIA as providing the jurisdictional rules. There are extremely few causes of action that expressly apply to foreign governments, foreign agencies and instrumentalities. By our count, our petition has them at page 30. There's one about chemical weapons regulations, one about nuclear weapons regulations, and one about certain drug trafficking crimes. So that is, I think, the biggest universe. I'm not even sure that that's relevant if you're relying so much on Kurtz and Kimmel and so forth, where it was just a broad cause of action. So you can't kind of have it both ways there. Justice Kagan, I am not trying to have it both ways. What I am relying on from Kurtz and Kimmel is the notion that when Congress expressly calls out this group of defendants, that's when we think maybe it's saying something on abrogation as well. How can that be squared with the language in the FSIA that says this is the exclusive statute that tells you when you abrogate? I mean, the problem, I think, and this is the point that Justice Sotomayor was raising, is that unless Title III speaks to abrogation, I don't know how you overcome the statute that says abrogation for foreign governments, look here and apply this rule. And you say, I think, from your original statement, well, you can overcome that or ignore that, because in this case Congress created a cause of action, repeatedly indicated that it wanted these kinds of suits to be brought against the government, it wanted fully effective remedies in court, and it wanted embargoes. I understood those to be the kind of thrust of your argument, but I think it has two problems. One is that it didn't speak directly to abrogation, and we know that cause of action and abrogation are two different things, in light of a statute that says look over here when you're looking for the abrogation answer. So that's one problem. And then the other problem is we had a clear statement rule in the world of jurisdiction and abrogation. So if Congress was relying on the kinds of things you're talking about, I don't understand how they even thought that that could possibly be enough to displace the statement in the FSIA that said this is how you abrogate. Justice Jackson, this would unequivocally pass the clear statement rule as applied to any other of the various sovereigns I mentioned, and then the question is, are foreign sovereigns better off because their immunity is put in a statute? The question is, does the Foreign Sovereign Immunity Act apply to the other sovereigns you mentioned? The answer is no. When we're in the world of foreign sovereigns, we have a special rule that Congress has carved out that tells us this is how you determine whether abrogation occurs for foreign sovereigns, and the only question here is whether what Congress does in Title III is enough to displace that rule, as opposed to we look at this and we think Congress was setting up a cause of action in Title III and relying on its long-established preexisting rule for how you abrogate. Justice Jackson, what Congress did here would unequivocally be enough for any other foreign sovereign, and so then the question is, does the existence of the FSIA— For any other foreign sovereign? Excuse me, any other governmental sovereign. Right, and so my answer is, is it enough for any other foreign sovereign? Does the existence of the FSIA mean that we need an even clearer statement, a clear statement above the clear statement? No, the question is, can you harmonize the two statutes? I keep going back to that point. Look at your Iraq question, okay? There, the court was looking at the FSIA and the presidential provision, the EWSSA, and what we read there was the FSIA has a default waiver of Iraq's sovereign immunity. The EWSSA permits the president, quote, to make inapplicable with respect to Iraq any provision of law that applies to countries that have supported terrorism. The two are addressing exactly the same thing, and they're saying you can do one. The president can do one. So that was clear. We were trying to harmonize those two statutes and said, yes, the president has that power. Here, the way to harmonize the two statutes is to say it applies only to commercial exceptions permitted by the FSIA. And, as in Kurtz, or unlike as in Kurtz, the two statutes, if harmonized in that way, still make this operative. Still permit suits against foreign sovereign entities who engage in commercial activity. That is a way to harmonize them. I don't think it is a plausible one. The other way to harmonize them is by... Well, we go back to what's plausible. Here, you have a suit that has survived the motion to dismiss. We know Western Union has business there. The suit is against an entity that's doing business with Western Union. There are ways, and there is money flowing into, even with the embargo, as extreme as it is at the moment, there are still many commercial investments going on in Cuba. Justice Sotomayor, again, the question we're looking at is 1996, when Congress codifies an extremely restrictive embargo in 6032H, it adds provisions preventing circumvention in 6040, and it allows extremely few exceptions for humanitarian links. And the question is, should the statute be read to allow causes of action only in the rare circumstances where they can find a connection to one of those humanitarian links? I think that is an implausible way to harmonize the statute. Thank you, counsel. Justice Thomas? Justice Alito? If Congress didn't think that the FSIA applied to Helms-Burton actions, why would it have amended the FSIA's execution immunity rules for those cases? So, Justice Alito, I think 1611C is a little hard to understand. It can either be read as a, we don't think there's a conflict here, but a belt and suspenders, we want to avoid anyone thinking there is, or it can be read as suggestive that with respect to execution immunity, the FSIA provisions apply. I think it has to be the former way, because elsewhere, Congress expressly and selectively incorporates FSIA provisions, including in 6082C2, and I think in combination of that and C1, where Congress says we want to apply only the provisions of Title 28 that apply in Section 1331 cases, which does not include the FSIA. When you read those in combination, I think that you can only read 1611C as kind of a belt and suspenders provision. Thank you. Justice Alito? Your point is statutory history, so do I. And I take seriously the fact that the originals, both Senate and House bills here under Title 3, included a waiver of the SIA, FSIA. And so it's not clear to me that when Congress took it out, why we would be putting that waiver back in. So, Justice Sotomayor, if you really dig in on the legislative history, I think it becomes clear that Congress did not change its mind on whether to abrogate. It changed its mind on whose immunity to abrogate. So in February of 95, the bill is... So why did it say that directly? I know. But that's assuming that it's clear that it took out the Cuban government and substituted subsidiaries and agencies, correct? That's what you're relying on. Correct. But that still begs the question. The DOJ had made very clear that abrogating sovereign immunity of the government and its instrumentalities would be a violation of international law, correct? Correct. All right. So it took out any suggestion that it was abrogating sovereign immunity, dropped it from both bills, dropped the federal government that kept foreign instrumentalities, but from that history, why would I assume that it was intending to abrogate immunity? Justice Sotomayor, that is not the correct history. The history is February of 95, the original bill abrogates immunity under the FSIA for governments themselves. Then there's an outcry about various aspects of the bill. August of 95, they take out that immunity provision, and they add in this specific reference to claims against agencies and instrumentalities. But they didn't intend to take it out, to take out the waiver of FSIA, because FSIA goes both to the government and to the agents and instrumentalities, and the government's letter was complaining about all of this being in violation of international law. So, Justice Sotomayor, two quick things. One is the FSIA provision section 1605, although it does cover both foreign states and agencies and instrumentalities, there's no specific existing provisions carving out just agencies and instrumentalities. So, although I could write that language for you, Congress did not have a copy-and-paste job once it got rid of foreign states. And second, if you are looking at that legislative history, I do think you have to look at the fact that the State Department, two months after this amendment, continued to say, well, now it applies to agencies and instrumentalities, sure, but it is still going beyond the FSIA. That likely ground the bill to a halt in the fall, until Cuba shot two planes out of the sky, and all of a sudden super-majorities of Congress passed, and the President signed this law within 17 days. The other side says that you need to take account of the provision that allows the President to essentially have an on-off switch here. And one of the amicus briefs talks about that at some length. In other words, it would be quite extraordinary for Congress to allow billions of dollars, tens of billions, hundreds of billions of dollars to be decided by an on-off switch just at the President. There's really no constraints on the President's ability to do that in the statutory language, like national interest and transition to democracy in Cuba. And they say, for that reason, we shouldn't assume Congress intended to give that huge power to the President, so therefore choose the narrower second option, as you first described them, I think, rather than the first one. You want to respond to that? Yes. So, Justice Kavanaugh, I think it's exactly the opposite, which is the whole reason we needed this presidential fail-safe is because claims against the Cuban government could be so substantial that they would interfere with its progress to democracy. And that's why there are four separate suspension provisions throughout the statute that give ways to toggle on and off claims, including claims and judgments against the Cuban government specifically, as necessary to help diplomatically toward a democratic Cuba. And there's no reason to include those if what we're talking about is a couple edge cases that are linked on to some humanitarian food exports. Then we don't have the wave of claims against Cuban governments that would cause a need for that kind of presidential backstop. So you don't think there's some kind of clear statement required in connection with that? That's what they, I think, are saying on page 47 and then the amicus brief also. In other words, we'd expect Congress to speak really clearly if they're going to give the President so much power. I mean, first, I think Congress probably thought it was putting on more constraints. In fact, if you are looking at the legislative history, the conference report said that we don't think in good faith the President could actually impose the suspension. But leaving that to the side. Well, it was in place then from 96 to 2017, right? It sure was. I think the President and Congress probably had differing views. But what they didn't have differing views on was the importance of this wave of claims against Cuban instrumentalities. And that's why you need to have four different suspension provisions to toggle on and off for all the diplomatic circumstances. You just don't need that if we're talking about a couple edge cases getting through. Thank you. Justice Barrett? Senator, do you think that the Libertad Act abrogates sovereign immunity for agencies and instrumentalities of countries other than Cuba? So we've stated in our briefs that the answer is probably yes, if that question ever came up to the court. We have sort of a host of statutory indicia. Most of them would apply to everyone. Some apply only to Cuban instrumentalities. I think there's probably enough that Congress would have said other nations who have instrumentalities that are knowingly and intentionally trafficking in the confiscated property that they'd be on the hook to. But we don't think and the government doesn't think the court needs to answer that question, given that some of the indicia are Cuba-specific and we've never seen a non-Cuba. Well, I mean, I think the thing that's hard for you is that you have a lot in the statute that points to Cuba and that makes Cuba an exception. I think it's a different question, a slightly different question, whether the statute is clear enough if you're talking about other sovereigns. And so even though I agree with you and the government that we wouldn't have to answer that question directly, I think it lurks in the background of deciding whether this waiver or this abrogation is clear enough. Yeah, Justice Barrett, I don't think the 1996 Congress would have had any qualms if other entities that were, again, we're talking about instrumentalities, so essentially state-controlled companies, were partnering with Cuban state-controlled companies knowingly and intentionally trafficking that they would be swept in just as private parties are. But again, if the court does have qualms about that, it's a purely hypothetical circumstance at this point, so we don't see any need to weigh in on it. Justice Jackson? So it seems to me that the thrust of your argument is that we should look at this language in Title III and know that it is clear that Congress meant to allow these claims and judgments to go forward because Congress wanted these claims to proceed. The political and foreign policy circumstances were such that, you know, Congress was sort of punishing Cuba for having confiscated people's property, and I see that. But how do you respond to all of the evidence that we have that indicates that that really wasn't, in other words, the claims process really wasn't the primary thrust of this statute? This dovetails with what we were talking about in the earlier case, that when we see that what Congress was trying to do was to isolate Cuba economically by deterring third-party investment, then maybe when it set up this cause of action, it really was like I'm just going to let the regular rules operate as to whether or not you can actually bring a claim because my focus, I'm impersonating Congress now, my focus is on this third-party investment problem that I'm trying to solve. You say yes, but you set up a cause of action, so that must have meant that they also intended to abrogate sovereign immunity, and I guess I don't necessarily see why that's the case. So, Justice Jackson, the thrust of our argument is not just that Congress set up a cause of action. It is that this is woven into the architecture of the statute. When Congress talks about who would be defendants, well, the only defendants it calls out by name are foreign instrumentalities. When it talks about specific rules for claims, the only particular claims it talks about are claims against Cuban instrumentalities. Right, so it appreciated that claims could happen. I'm not faulting you or saying that that's not in there. What I'm asking you is whether it intended for those claims to happen under the circumstances that the FSIA would allow. And I think the answer, the two best pieces of evidence on that for why the answer is no, one is the embargo we've already talked about, especially the embargo as codified in 1996, and two is Section 6032, excuse me, Section 6082C, which says apply the provisions of Title 28 that apply in Section 1331 actions, general federal question actions. That does not include the FSIA. All right, let me ask you one more and then I'm done with this part. How does allowing this flood of claims to come in advance what I see as Congress's primary purpose? I think you get a little bit more mileage out of it if you're saying they absolutely intended to abrogate sovereign immunity with this cause of action, notwithstanding the existence of the FSIA, and they're not saying anything about that, because we know that they were trying to deter third-party investment and somehow this is going to help that. So help me figure out how allowing this flood of claims is actually aimed at furthering Congress's primary purpose for this statute. Because the primary purpose was not just third-party traffickers. The other primary purpose, probably the primary, primary purpose was the Cuban government itself as the key culprit here. And so preserving FSIA immunity would give a Cuban instrumentality a pass when a comparable private company would be on the hook for a trafficking claim, and the Cuban company would get a pass by dint of its relationship to the Cuban government. That is hard to square. There's foreign policy implications. The U.S. government is actually punishing Cuba. But, Justice Jackson, this is a statute that a couple provisions earlier has accused Cuba of, quote, cold-blooded murder. It is a couple provisions before that has said residential property is off limits unless you're associated with the Cuban government, then we're going after your house, too. And your point is that the statute is authorizing private individuals like Exxon to be like an AGE to punish the Cuban government for that? No, Justice Jackson, my point is it is implausible that Congress would have wanted a Cuban company to fare better than a private trafficker given all of the other statutory signals. Thank you. Thank you, Counsel. Mr. Gannon? Mr. Chief Justice, and may it please the Court, taken together, multiple provisions of the Libertad Act clearly show that Congress abrogated the jurisdictional immunity of Cuban agencies and instrumentalities without regard to the Foreign Sovereign Immunities Act. Apart from the definition of person, other provisions clearly contemplate that Cuban agencies and instrumentalities will be defendants against whom judgments may be obtained. But two more provisions particularly establish that the FSIA does not generally apply to Title III suits. Section 6082C1 makes it clear that such suits are brought under 28 U.S.C. 1331 rather than the neighboring section that supplies jurisdiction for suits under the FSIA itself. And then 6082C2 affirmatively brings in a particular section of the otherwise ousted FSIA. The decision below would effectively negate suits that Congress authorized, thereby compromising a mechanism that Congress and the Executive have concluded will promote U.S. and national interests and a transition to democracy in Cuba. This Court should reverse that decision. I welcome its questions. Should we treat the assertion of sovereign immunity here any different from the assertion of sovereign immunity in Kurtz? I think that we take comfort from the fact that we have a lot of additional provisions. I don't — I'm not quibbling at all with the idea that there still needs to be a clear statement. And to the extent that Justice Jackson was asking questions about the fact that we have a statute here that makes this different, we're not just talking about sort of a common law background. We're trying to reconcile two different statutory schemes. I would say the point that I just made makes it clear that Congress was displacing the FSIA as the background rule here when it said that this is an action that's going to arise under 1331. The jurisdictional provisions of the — jurisdictional immunity of the FSIA goes through Section 1330. 1330 says that jurisdiction exists when an exception to the FSIA has been satisfied. And here Congress said that's not the statute that governs this action. It said this is a federal question of jurisdiction. So do you think that these two statutes can be reconciled? I think that the — I think that the — as my friend was just saying, I wouldn't reconcile them by saying that you need to go through both gates. I understand that that's a normal thing to do when you're looking at two different statutory schemes. I think Congress has already made the decision and said we want this not to be an FSIA suit, and they did not want this to be a Swiss cheese situation where there would have to be some incidental overlap that would allow you to get through one of the — like the commercial activities exception here. I'm sorry. Ken, answer the question. Could you go through both gates? I think — Is it impossible to go through both gates? I think in the vast majority of suits it probably is going to be impossible. I didn't ask that. There are still a swath of cases — I am not going to say that there will never be a suit where the plaintiff could satisfy the commercial activities exception, but I think that that's a gross mismatch between what Congress was targeting here, which is trafficking in all of this expropriated property, especially when the Cuban governmental entities are the main — they're the main culprits and beneficiaries of that trafficking — The main culprit was the Cuban government, yet Congress dropped the Cuban government as one of the potential defendants, so I don't see how there was congruity there. Two amicus briefs, the Foreign Sovereign Immunity Scholars and the Foreign International Law Scholars, raise the Charming Betsy canon of interpretation. We know Charming Betsy was at the founding, and we know that Congress wanted to push the boundaries of international law with Title III, but Charming Betsy cautions us to try to construe statutes not to violate international law. Here, not only is it pushing it to a private cause of action against the Cuban government and its subsidiaries, Justice Barrett has asked the Petitioners' Council whether they could also sue other countries' agencies and instrumentalities, and she said yes. What's your position on that? Well, I'm happy to start with the third country's question, but I also want to get back to talk about the customary international law point that you were making about Charming Betsy, and with respect to third countries, footnote five in our brief doesn't take a position on this. Isn't it the logic of your position? If you're saying that it abrogated the FSIA, why would that abrogation? Because it doesn't say it abrogates sovereign immunity with respect just to Cuba. I think that several of the provisions are Cuba-specific. Several are, but not all of them. I agree with that, Justice Sotomayor, and I think that it is clearer that there is an abrogation with respect to Cuban agencies and instrumentalities, and I think that that would be enough for the Court in this case. But if you think that it's all or nothing, then I would make two points that would mitigate the potential risks associated with that. First, to our knowledge, there's not a single pending title-free case that brings any claims against third country agencies and instrumentalities. Once we say it's okay, even if we reserve the question, you know that we're inviting that litigation. And my second point is, to the extent that it looks like that's going to be any sort of problem, then the president has the suspension power, and he could suspend or partially suspend the right to bring title-free actions if he thought that that was going to create foreign policy problems. And that also was part of my answer to your question about the customary international law point in Charming Betsy, which is that the administration, the executive branch, was very concerned about exactly those types of things when this statute was, when this bill was being debated in 1995 and 1996. And the State Department letter that my friends on the other side quote specifically said that the suits against agencies and instrumentalities would go far beyond current exemptions in the FSIA. The executive branch was concerned about this, and I think Congress's response to that was to say, we are going to exercise our power to go beyond what the FSIA currently allows, but if you were to adopt the respondent's reading here, then that would not be the case because it would not be able to go beyond the FSIA if they also had to comply with the FSIA. And the one change that I think Congress made after that point in the legislative development that is relevant to this is that at the executive branch's request, they granted the president the suspension power. And the suspension power is a way for the president to help manage whether he thinks that the risk to foreign policy, offending foreign sovereigns, whether we're going beyond what customary international law allows, is worth it with respect to the U.S. national interest and expediting the transition to democracy in Cuba. Which way does the suspension power cut here? I'm trying to figure that out because your rhetoric and petitioners' counsel is Congress really wanted to allow these suits and not have them subject to the gatekeeping of the FSIA. And yet Congress gave the president unlimited power to say no, almost unlimited power to say no, which then happened for the next 23 years. And that's really just based on national interest. Basically, it's completely up to the president. To be clear, Justice Kavanaugh, I do think it's quite clear Congress gave the suspension power to the president with those qualifications, and so I don't think that there's something that we need to sort of decline to think that Congress gave him that power. Let me just finish. I know they gave him that power, and this is my question. Just how should that affect how we think about the FSIA? Because it's not just, oh, Congress wanted these suits tomorrow. Well, I think it suggests that they recognized that they were going past what the FSIA would otherwise allow and that therefore there was a need to have this extra potential governor on the speed of the process, but they were very clear that they wanted it not just to be U.S. national interest. They actually changed the phrasing of what the executive branch requested, as explained in the conference report, and some of the floor statements associated with the adoption of the final bill to say that they wanted it to be U.S. national interest and it had to promote expedition of a transition of democracy. That's 100 percent in the discretion of the president. That is his determination to make. He reports it to Congress, and that's the power that he has to suspend this. So this transitions us back, the statute, when you put the presidential suspension part into it, really transitions back to the pre-FSIA when it's just up to the president. Which might be the right answer here. I'm not saying it's not the right answer. I think what Congress has done is Congress has actually sort of created the default rule here, which is that these causes of action will proceed, these will be appropriate defendants, and the FSIA is not a separate thing. It's totally up to the president whether these claims can proceed. The president ultimately has the ability to decide that. If he is doing it for the purposes that the Libertad Act was intended to promote, which is encouraging a transition to Cuba, to the extent that these types of trafficking lawsuits are a problem, if it's because they're... Do you think that's judicially reviewable? I mean, this is getting in the weeds, but since you're putting so much weight on that second clause, do you think a court could review that, this determination that it was... I would not expect that to be judicially reviewable. It's something that he needs to refer to Congress. I think that there's political accountability associated with that, but that Congress recognized that this is going to be a situation that had been evolving for decades, that it had taken them decades to get from the Foreign Claims Settlement Commission to this, but they wanted this to go as fast as it could, with the President able to make judgments according to the way circumstances developed. Thank you, Counsel. Justice Thomas, anything further? What are the practical implications of the interesting question in this case? Unless Cuban instrumentalities have property in the United States against which a judgment could be executed, what difference does all of this make as a practical matter? I think that's an excellent question, Justice Alito. And as a practical matter, that might even... that sort of obviates the need to even answer the question about 1610 and 1611c. If CMEX doesn't have any assets in the United States, then the execution immunity question that you were asking sort of drops out. But that doesn't mean that there isn't value to having a judgment, and there's nothing anomalous about having the exceptions to execution and attachment immunity be narrower than the exception to jurisdictional immunity. The court observed that in NML Capital. And in some suits, it literally is the case that the plaintiff simply can't collect on a judgment that it got, consistent with an exception to jurisdictional immunity under the FSIA, unless there's a waiver of the defendant. But that doesn't mean that there isn't value to having a judgment. It can be taken to courts in other countries. To the extent that this goes beyond what customary international law allows, those other countries may be less likely to enforce, depending upon what the situation is. But, you know, I think that a company like Exxon that had, you know, $10 to $70 million expropriated in 1960, and you see a lot of suits that come here occasionally where long-lived corporations and others have investments that they want to vindicate. They get a judgment. It may take decades for them to find property in an appropriate case where they can try to attach. But that doesn't mean that they don't think that there's some value beyond just having a certified claim from the foreign claimant. Yeah, perhaps I should have asked this of Ms. Ratner, and she can address it or not if she chooses when she gets up for rebuttal. But, I mean, I assume Exxon has some financial reason for doing this, and it's kind of beyond me what the value of this judgment is going to be. If it can't be executed in the United States, which seems likely, and its value is dependent on registering it in a foreign country and trying to execute it there when the Helms-Burton Act goes beyond international law, that really seems like a long shot, but I'm probably missing something. I mean, it might be a long shot, but as I said, that's not at all anomalous under the FSIA. The way it is designed, it is often the case that somebody can get a judgment, and there is literally not an applicable exception to execution immunity that is satisfied merely because they already had gotten through the gate of jurisdictional immunity. Thank you, Counselor. Do you see 6082C as a jurisdictional provision? Yes. I think that it points us to 1331 as the basis for jurisdiction. But it doesn't. It says procedural. The first section is labeled procedural requirements, not jurisdictional, and the first subsection states that, quote, the rules of the courts of the U.S. apply to actions under this subsection to the same extent as such provisions and rules apply to any other action brought under Section 1331. So it's only talking about procedures. It's not talking about jurisdiction. I think what it is saying is that all the provisions of Title 28 apply as if it is a federal question jurisdiction action like any other, and it uses the word other. And I think there's no way to read the word other there without making it say that this, too, is an action under 1331, which means that this is not an FSIA suit under 1330. It's a federal question jurisdiction suit. There's also a separate amount in controversy. Sotomayor, we're still back to the original question, was the intent to repeal the FSIA, but that doesn't tell us that that was its intent. I think because it's pointing to the jurisdictional provision of the FSIA. No, it's pointing to procedural requirements of 1331. But I think that that reads out the word other. If you wanted to just say we're going to treat this as if it is a 1331 action and use those procedures, we're going to borrow those the way it borrows other provisions from the FSIA, the very next subsection, borrows its service of process rules, says use the rules, the service shall be made in accordance with Section 1608. They feel like they have to go grab a provision of the FSIA and pull it in and make it applicable. Here they said Title 28's rules apply here like it's a 1331 suit, like other 1331 suits. It doesn't say it's like it's a 1331 suit. It says it is another 1331 suit. And so I think that the only way to read that is if it's under 1331, it's not under 1330. They could have said 1330 or 1331. They could have said depending on which defendant you have, if it's against a foreign sovereign you would want it to be a 1330 suit. If it's against the cruise ships from the first case this morning, it's a federal question jurisdiction case. They didn't say that. They said it's 1331. And I think that the combination of these two provisions back-to-back, I take the point that the heading is procedural requirements, but that they're telling us building block things about the case, which is where do you get jurisdiction and how do you get service of process and hence personal jurisdiction. And so I do think that that shows that Congress was making the jurisdictional decision here, not just the liability-creating decision, as Justice Kagan was previously asking. Justice Kagan? Well, I don't know. I mean, it seems to me you're asking us to do something very unusual here, which is to take a statute which does create a cause of action and a cause of action directly against foreign sovereigns, but to say that just because you've created a cause of action against foreign sovereigns, you're also abrogating immunity when you know that there's a Foreign Sovereign Immunities Act that is in charge of the immunity question, if you will. And it raises the question, you know, and this is not a magic words test. It's like they could have done it in a thousand different ways, but why didn't, rather than this very peculiar, you know, reference to 1331, which it's pretty unclear what it means, but why didn't Congress just say, like, you know, we're displacing the FSIA with respect to this, so we're abrogating sovereign immunity, or just give some indication that that's what it meant to do, other than create a cause of action, which is a completely different question in the foreign sovereign immunity context. I think that it did both. I mean, I just have to go back to what I said in my intro, what I just said in response to Justice Sotomayor. I think the only way to read 6082C1 and C2 is to say that Congress here was speaking to questions of subject matter and personal jurisdiction with respect to foreign sovereigns. And that's the reason, I mean, if they wanted it to just be about other defendants, like the cruise lines, then they don't need to be. So you're really saying it really hinges on those two little pieces. Those are the best indications we have that Congress is actually talking about it in the jurisdictional sense. Yeah, so you're not making a point that, like... But we have all the other confirmatory provisions that might register a law. But you're not saying, oh, you know, like, Kurtz definitely controls this because whenever you have a cause of action against a government, that answers your question. You're not saying that. That is correct. I think we're asking for Kurtz Plus. We think that the cause of action language, I don't want to minimize the importance of it. I think that the fact that the 1996 Congress used the same words that were able to waive federal sovereign immunity when they were talking about foreign instrumentalities and agencies, I think that that is a compelling indication. But I think here it is important that we also have specific references to Cuban government agencies and instrumentalities all over the statute, and we have these provisions talking about what I'm calling an ouster of the jurisdictional portion of the FSIA. If I could take you back to Justice Alito's question, and let's assume that I think that this execution immunity provisions in the FSIA really continue, you know, that there's no reason to think that they didn't continue on, and indeed the fact that this statute amended them a little bit made it clear that Congress thought that they were going to continue. So then the point is to... in a highly unusual way in order to abrogate sovereign immunity in cases in which even putting aside the practical issues that Justice Alito was talking about, there are legal bars to collecting on your judgment against a foreign sovereign. So, like, why would Congress have done that? I mean, you could ask the same thing with respect to other parts of the FSIA's immunity exceptions that aren't echoed in the attachment exceptions. As the Court said in NML Capital, it's a smaller set of exceptions for execution and attachment immunity than it is for jurisdictional immunity. And since then, the mismatch has actually grown. 1605 capital B, a new provision that Congress added in 2016, literally has no parallel in execution immunity. And so you have a waiver of jurisdictional immunity with respect to acts of international terror in the United States, and there's no corresponding waiver on attachment and execution immunity. Yeah, and I guess one aspect of this is if sort of the thrust of the argument, and I know you're trying to hook it into these technical provisions, but if a thrust of the argument is Congress was really concerned about this problem and it really wanted to go after these agencies and instrumentalities because weren't they the ultimate bad guys here? I mean, if that's really what Congress was trying to do, it proceeded in a very odd fashion because you're not going to get anything from them anyway, given that the execution immunity exists. Take out the execution immunity. They're still going to be... Well, take it out. That was the question. Well, no, but my point, Justice Kagan, was going to be back to what you alluded to, I thought, is the practical considerations that Justice Alito raised, which is that Congress knew there were not going to be very many Cuban assets in the United States anyway. Now, we have some blocked assets that our government has been holding for decades, and maybe...  What Congress did not do was to touch executive immunity, execution immunity provisions, that were putting aside the practical concerns, were going to prevent, as a legal matter, these agencies from having to cough up. I think that 1611C is ambiguous about whether they were displacing 1610 or not. I think, as my friend pointed out, notwithstanding clauses often create this type of ambiguity, whether they're going to be... whether there's a negative implication or whether they're just belt and suspenders. And so we haven't taken a position on that. But as I'm saying, I think that it is quite common for there to be a mismatch between these two types of provisions, and I don't think when Congress was saying that it wanted these types of lawsuits to proceed and they wanted them to be a tool for foreign policy, that even if at the end of the day there wasn't going to be collection against actual Cuban property that was already in the United States, Cuban governmental property that was already in the United States, that doesn't mean that there isn't some power to having a federal judgment that says, look, Cuba is actually... people are trafficking in this expropriated property. There should be treble damages. This is something that people should be held accountable for. We haven't forgotten this. These are U.S. nationals whose property was wrongly expropriated. We want there to be something done about it, and we want there to be the poison pill that my colleague talked about earlier that would deter others from cooperating with the Cuban government. Justice Gorsuch? Justice Barrett? Justice Jackson? Yeah, I guess I'm just trying to puzzle through why where you landed with Justice Kavanaugh, that Congress wanted to go back to the pre-FSIA world in this particular context, such that the president was controlling when these suits go forward and when they don't. I guess I don't understand why that doesn't put the onus on Congress even more so to be clear about its intentions in doing that in light of our clear statement rule. I mean, that's a huge thing. That's not just we want these individual suits to go forward. I hear you saying, no, what they were really trying to accomplish here was to repudiate in this particular circumstance the reason why the FSIA was put into place, which was to prevent this ad hoc president deciding when and when not to let these suits to go forward. So if Congress was really doing that, why wouldn't they have said it? Wouldn't we expect that they had to have said it in order to satisfy our clear statement rule? I think that what Congress did is essentially exactly what they did in the Beattie case. That Justice Sotomayor was reading from before, which is to say the default rule here is no sovereign immunity in this context. We are adding a waiver, an abrogation of sovereign immunity for these specific circumstances. Okay, but first of all, they didn't say that. Those words aren't in the statute, but that's what you're saying. I appreciate. I just want to be clear. They didn't say that. You were implying that they did that from saying we want these claims to go forward, right? Yes, and then I'm saying that the waiver power on the back end is something that provides a couple of different functions. One is that it ensures that these aren't something that's actually going to slow down a transition to democracy in Cuba and make it counterproductive. And two, it makes it possible for the president to put back in this narrow category of cases the protections of sovereign immunity that for six months at a time, I mean, he can only suspend the ability to bring new lawsuits. He can't actually just cancel out one. I understand, but we don't need to put... Once the lawsuit is filed, this is not the same as the pre-1980s. I understand, but we don't need to put it back in if the FSIA is doing its work to begin with on the front end, and that's the question in this case. So it's just a little odd, I think, to... I think that a lot of these arguments are really just trying to get around the fact that what the US government did in this Title III action is pretty extraordinary in general, and we would have expected that if they were creating a cause of action like this, they would have addressed the sovereign immunity question. And in the absence of any statement about sovereign immunity, the question is, did they intend for the FSIA to be operating, or did they intend that by not talking about sovereign immunity, we would read this statute to necessarily mean that sovereign immunity is abrogated? And it seems to me the second is more implausible. I know what Ms Ratner said, but it seems to me that the kind of natural way of looking at this is that when Congress was silent in Title III about abrogation of sovereign immunity against the backdrop of a statute that governs how you abrogate sovereign immunity, that it was intending to allow that statute to operate. And if it wasn't, we would have expected them to say that. Well, and we have several different provisions that are, like, pulling individual provisions out of the FSIA and incorporating them here. They're doing all that. We know that Congress was legislating against the FSIA. We know the executive branch had raised concerns about going beyond the FSIA. I think that the suspension power is a way to ameliorate those concerns, those international law concerns, and I think that what it indicates is that Congress understood that this was indeed strong medicine. The poison pill that my colleague referred to earlier today is strong medicine, and if it is so strong that it might kill the patient, the president should be able to use his ability to evaluate foreign policy and what's going to happen in Cuba in order to decide we're going to pull back a little on it for 6 months at a time. Thank you. Thank you, Counsel. Mr. LaBelle. Mr. Chief Justice, and may it please the Court, Section 1604 of the Foreign Sovereign Immunity Act provides that foreign state instrumentalities shall be immune in U.S. courts unless one of the exceptions in 1605 to 1607 are met. Nothing in Title III's text abrogates that immunity. Title III's cause of action is not inconsistent with that restrictive, non-absolute immunity. Congress considered whether to create another exception to immunity and decided not to when the executive objected. This Court should not read in an exception where Congress did not enact one. Rather, the Court must harmonize the two statutes if there is any way possible to do so. And here, it is obvious that it's possible. Title III allows lawsuits against foreign instrumentalities where one of the FSIA's exceptions are met. Petitioner, therefore, pivots to a practical argument that because of the embargo's heavy restrictions on trade with Cuba, few Title III suits could succeed. That policy argument can't substitute for the absence of an explicit textual abrogation or an irreconcilable conflict between the two statutes. But moreover, Petitioner's factual premise is just wrong. Helms Burton gave the President the power to ease the embargo, and there are now 70 general licenses that have resulted in $8 billion of exports from the United States, billions of dollars in remittances, and millions of travelers flowing to Cuba in the last two decades. Finally, Petitioner concedes that under Title III's text, if there is abrogation for Cuban entities, there is abrogation for all the instrumentalities of all countries that trade with Cuba. I welcome the Court's questions. Could you give an example of an action, a Title III action, that could be brought consistent with an exception under FSIA? Sure. There are now 50 Cuban importers that import millions of dollars of goods from the United States, grains, chickens, all sorts of goods, under general licenses. They enter into a contract with an American exporter. The American exporter ships the goods. The Cuban importer pays the money to the exporter. That is a direct effect. All of those Cuban importers could be sued if they're using expropriated property. The ports, the docks, as we heard this morning, the airports, the warehouses, their offices, all of those are likely to be on expropriated property. That's one. Second, the case you heard this morning. Havana, when the cruise ships went into the docks in Havana, there were six Cuban instrumentalities that either owned or operated those docks. Havana docks could have sued any one of those. And there are innumerable cases. But the key point is that Helms Burton gave the president the power to expand or contract the embargo. And various presidents have used that to either ease the embargo or expand it. And you cannot fix in time whether or not this was going to happen in 1995, 1996, or now. There has been an enormous expansion of trade with Cuba, and that expansion allows for the possibilities of many suits. But back to Justice Sotomayor's question before. I don't think this Court can evaluate how many suits there would be, whether it's too few, whether it's too many, what to do about it if it's too few. That's the job of Congress. This Court's job is to evaluate the text and see if there's an irreconcilable conflict. And as I think in their answer... On that, I'm sorry to interrupt, but you keep mentioning irreconcilable conflict. I think Ms. Ratner might respond, well, my duty is to show a clear abrogation of sovereign immunity, not that there is some way to reconcile these two statutes. That only comes in when we get to implied repeals under our case law, Carcieri v. Salazar. And we're not dealing with, she would say, an implied repeal here. We're dealing with an express repeal. And she has evidence, and you may find that insufficient or adequate, and we can have that argument. But I think what she would resist, your suggestion that she has to show a super, super clear abrogation, not only show that Congress abrogated sovereign immunity, but that it also made clear its intention to displace the FSIA. Thoughts? Well, there are two statutes, so they have to make clear. You have to reconcile the two statutes. Well, not necessarily. Carcieri says you have to reconcile them when one's an implied repeal. And again, I think her argument would be, I'm not arguing about them. She would say that too, of course, because she wouldn't give up anything. Fair enough. But I think she'd say my primary argument is that there's an express repeal. And so, yes, in other circumstances you go to the FSIA. But here, why couldn't Congress, for example, I mean I think we've talked about it in Title III, if it had said we abrogate sovereign immunity, nobody would be talking about trying to reconcile that with the FSIA, right? We just wouldn't be doing that. We would be taking the statute on its own terms. And she's saying that's essentially what happened here. Now, you may disagree with that, but this reconciling of things really is kind of a sideshow, isn't it? You're right that I disagree with it. There is undisputably no express repeal. Oh, fair enough. Undisputably. But you'd agree with me, though, that if it were an express repeal, we wouldn't be talking about reconciling things. Correct. Okay. And what Kurt said about an express repeal is if the statute said in so many words that it was stripping sovereign immunity. And that's the real question for us, isn't it? But that's not here. Okay. I understand that point. If that's the real question, we win undeniably. There is no express repeal that anybody could read. I think it would probably be deniable by Ms. Ratner. Okay, yes, I'll agree with that. And by the U.S. government. And maybe the U.S. government. But hopefully none of them. Right, exactly. Let's talk about that, though. And I understand the toggling on and off switch by the president can cut both ways. But one way in which it could cut against you, potentially, is why would Congress have put that in there except for if it thought that the FSIA didn't apply, and it was kind of reverting to the old rule in which courts would ask the State Department whether or not a suit should proceed as a matter of comedy and grace. One, they didn't put it in there because they thought the FSIA applied. This statute, Title III, violated international law, extended U.S. jurisdiction in many controversial ways. And the president, Secretary of State Warren Christopher, said the statute in general, Title III in general, should not be enacted. Because of the very cases that you saw this morning. But again, they could sue if the Foreign Sovereign Immunities Act doesn't apply. They can sue Russian airlines. They can sue Chinese airlines. They could sue Qatari airlines. They could sue any— Mr. Lobel, if I might redirect you to the question. Okay, I'm sorry. Why would Congress have put that toggle switch in, giving the president the opportunity to turn on and off liability, if it weren't concerned that there would be charming Betsy international law possible concerns? And it was essentially saying, isn't it kind of an acknowledgement we're not doing the FSIA, we're kind of doing the old regime, the ancient regime, where the State Department tells us whether or not a suit should proceed. Two responses. One is they were worried about private suits against— Private parties. Not instrumentalities, but private parties all around the world. I take that point. And that's why they wanted the president to have the right not to suspend the FSIA, but to suspend the cause of action generally. First of all, they didn't say you can suspend the cause of action against foreign instrumentalities, or they said you can suspend the cause of action because the cause of action itself was very controversial. And second, they didn't want the president to toggle on and off on immunity. They just said the president can suspend the cause of action, but they didn't say anything about whether the president could override immunity. The effect is the same. Looking at the structure of the statute, to pick up on Justice Gorsuch's questions, the president has a huge role in the statute. So that's looking at the text. And then you look at the real world of what's happened since the enactment of the statute. And the president's been front and center every six months for 23 years. And that effect was those suits couldn't go forward. And the question I think I have looking at that and looking at the real world is similar to Justice Gorsuch's, but it seems like it would be odd to put the president front and center, and then on top of that the FSIA as opposed to the whole idea was charming Betsy, international law, Cuba. The president is the person in our constitutional structure who can weigh all that as to Cuba, and the president's going to have the power, and that's how it's operated, and we don't go through this FSIA alternative that Congress had previously enacted. So that's one way to look at it. The president textually is given the power to suspend the cause of action. The text says nothing about the president's power to suspend immunity. Now, of course, Well, what's the difference between those two things in practice? In practice is that you can not suspend the cause of action. You can suspend the cause of action, nobody can be sued. Right. Including private parties. Including private parties. So this is a suspension that doesn't just have to do with foreign sovereigns. Exactly. This suspension goes way wider than that. Correct. So it's not clear that the suspension has anything to do with FSIA rules. I don't think it did. It had to do with the fact that the cause of action itself was very controversial. And the amount of resources against which attachment could occur is vastly greater against private entities, right? Correct. That's why the private entities are sued. Because more of them, including other foreign governments, have more property in the U.S., correct? No question about that. So the suspension, given what Justice Alito pointed out to, which is there's going to be very little assets of Cuban agency or the Cuban government in the U.S. Most of the assets are going to be in the private lawsuits.  But back to Justice Gorsuch's question, because I think it's central. Before you do that, I don't want to interrupt the chain of questioning, but I thought you told me, at least while you didn't tell me, that the receipt by a U.S. importer of money from a Cuban instrumentality would fall within the commercial activity exception of the FSIA. Correct. By a U.S. exporter of goods to Cuba, they would receive money back in the United States. Yeah, okay. But then you just, you know, two minutes ago, one minute ago, you said there would be very little property here to be executed on. Oh, no. If it was against a Cuban entity. If it was against a Cuban entity, they couldn't execute. But it would fall within the FSIA's commercial exception, because it would be clearly a direct effect. But back to Justice Kavanaugh. The text gives the President the power to suspend the course of action against anybody, private entities, cruise lines, Cuban entities, or any third country entity. It does not give the President... So it's even broader. Yeah, but it does not give the President the power to suspend immunity or to override immunity. What the President could do is say, no suits can be brought. The President does not have the power to say that once suits are brought, and if they are brought against a foreign government entity, I'm suspending the FSIA. That's a fair point. I just think it's structurally trying to figure out how this fits together. Well, but that's the way to harm... The provision allows for the suspension of the course of action, but doesn't give the President any power whatsoever about an immunity, except to prevent these courses of action. And the point I was making with the SG is that if it did, if Congress's intention was to give the President a toggle switch with respect to sovereign immunity, wouldn't we have expected to see that in the statute? Because that's like an extraordinary thing. Exactly, Your Honor. And as Justice Jackson alludes to, Congress made a considered, comprehensive determination that we didn't want the President to be doing this, because it led to all sorts of bad things. That was the point of the FSIA to begin with, right? Why do you think the Presidential provision's in there, given the FSIA? Because Title III itself was incredibly controversial. And the President argued not just that the foreign sovereign immunity exception should not be in, but Title III shouldn't be in. And actually, Warren Christopher, the Secretary of State, sent a letter to the House on September 20th, exhoriating Title III. It's bad for this reason, it's bad for that reason. He didn't mention one reason, foreign sovereign immunity, and that's because they knew they took out the exception. Maybe that's also because Cuba and its instrumentalities are the most culpable. So you're going to go after the private entities because that's where the money is, but maybe Congress and the Executive weren't as concerned about the sovereign immunity question when they were talking about Cuba. Right, but the question isn't Cuba's culpability. As the argument has shown, what Congress was interested in was deterring trade and transactions with Cuba. And if you look at the findings, 608156711, it's all about deterring third countries from entering into joint ventures, entering into trade with Cuba. And so that's what, but I don't think in any event... that it had expropriated.  Yeah. But that says nothing about sovereign immunity. Yeah, I mean, I'm not, well, I'm not fighting with you about that point. I'm just saying that I don't think this whole reliance on the Christopher Statement to the House does that much for you, but anyway. Well, no, I'm just, I used the Christopher Statement only to rebut the argument that Congress still must have thought or that the President still thought that there was an abrogation of immunity. The fact that Christopher never mentioned that, three months later after they took out the exception, meant that the President no longer thought there was an abrogation of immunity and therefore didn't argue against it at that point. Just to be clear where we stand, you've made some statements during your argument that seemed to me to suggest that you think that the mere fact that Congress did not say expressly that it was abrogating sovereign immunity is sufficient. That's the end of it. We don't need to look any further than that. Is that your argument? No. Okay. The question is what we can infer from what we see in the statute, right? In the relevant context. No, I don't think that's what you can infer. I think there's two ways that you've said in Kurtz and FOMB that you can abrogate immunity and that you can abrogate the FSA. Either some express language, which you don't have, or providing a cause of action against the government entities, in this case it would be foreign government entities, which would be rendered a dead letter, which would be rendered meaningless. Well, that's an interesting reading of Kurtz, but there's nothing in the opinion that talks to that. Well, certainly there's something in FOMB, which Kurtz relies on, which says that Kurtz itself doesn't say anything about that. It says negate. And I think that reading Kurtz in any other way would both be inconsistent with your precedent and would leave this Court, in all of those situations, down a path of determining what's not a dead letter. Is it like in the expropriation exception? Is it that there are 1% of claims that can succeed? How are you going to determine that? Well, if we knew that Congress thought that the immunity conferred by the Foreign Cyber Immunities Act would wipe out 99.999% of the potential claims that could be asserted under Helms-Burton, wouldn't it be a fair inference that it did not intend to preserve the Foreign Cyber Immunities immunity? I think the text governs because you can't determine whether it would knock out 99.99%. Well, what's the difference between 100 and 99.9 or whatever? Well, in the case of 100, you're inferring. They wouldn't have created a cause of action against a foreign government instrumentality if it was a dead letter. It's an inference. And I don't understand why the inference stops the minute you can find one in a million claims that might get through. Even if I agreed with you that you can make that inference, that's not the case here. Well, first of all, do you agree with Justice Alito? I do not. So I can only make that inference if 100% of cases are. If you look at the statute and you look at the FSIA and you look at Title III. No, no, no. Forget about the FSIA. We've dealt with that. We're just dealing with what's required to abrogate sovereign immunity. And you're saying, okay, you can either use the magic words or you can create a cause of action that would completely be useless otherwise. Correct. Zero percent of cases. That's right. You agree with those two things? I do. But once we get to 99.9% of cases, you say that same inference is unavailable. Because I think it's impossible to tell, looking at the statutes, how many, not in this case, but more generally, whether or not, how many cases are too few, whether or not they're going to succeed. If you could say, we know for certain that 99.9% of all the cases are going to fail, maybe then. All right. Okay, so now we're at 99. Right. Okay. How about 90? That's exactly my point. But you conceded 99? No, no. That's why I didn't concede 99. You didn't at first. I said maybe. Oh, maybe. Maybe. Oh, maybe. Okay, all right. But the reason that I don't want to concede 99 is because then you say, what about 90%? And the answer to that is the answer that Justice Scalia gave in the NML case. If you think that too many cases are being excluded, go to Congress. Get Congress to enact a new statute. Well, then we're magic words, right? No. I can give you an example where the FSIA, Congress could provide a cause of action without explicitly abrogating the FSIA, and it should be abrogated on the curse. Let's say there was a spate of automobile accidents in some country or some region of the world where all the automobile accidents were caused by foreign instrumentalities. And Congress enacted a statute. There was some ether going around in Congress, and they forgot that the FSIA existed, which clearly isn't here. They were staring the FSIA in the face. But let's say they said there will be a cause of action for any American national injured in an automobile accident that occurs in another country. That would be barred by 1605 — that would be barred by the FSIA's tort exception, because it requires that the tort occur in the United States. Isn't the real reason why we have to keep the Kurtz Avenue narrow is because if you don't do that, you end up end-running Congress's intentions with respect to enacting the FSIA. That we have a statute that Congress, as Justice Kagan said at the beginning, thought about the universe of claims that could be brought against foreign governments, said we don't want this being done in an ad hoc fashion anymore, so we're going to create a statute that lays out what we, the court has said subsequently, is the exclusive way in which you get to sue a foreign government. Kurtz comes along, and we see this kind of one circumstance in which we might conceive of an exception to application of the statute that Congress has created for this purpose. And it is this dead letter, you know, if you have a cause of action, but there's no way you could ever abrogate sovereign immunity or a cause of action against the government that you could never recover, then you go, okay, that really does have to be interpreted as a situation in which Congress did intend for sovereign immunity to be abrogated, notwithstanding the FSIA. But if you get broader than that, if we're in 99% of the cases, 97%, then you could have a rule operating outside of the FSIA to do the very thing that Congress didn't want the FSIA or didn't want to have happen, which is why it enacted the FSIA. So this exception has to be like really tiny or else we don't give effect to Congress's expressed intent to have the FSIA be the exclusive avenue for abrogating sovereign immunity. Exactly, Your Honor. Exactly. Well, the FSIA may have been the exclusive avenue when the FSIA was enacted, but the Congress that enacted the FSIA does not have the right to control what later Congresses do. And that's why we — I don't know where that — That's Justice Gorsuch's point, right? Later Congresses can say with respect to each statute, this — don't apply the FSIA here, and they can say that. But what's happening here is that we are now implying that later Congresses intended that. That language doesn't appear in this statute, but we're having a two-hour argument as to whether or not we should interpret it. And I don't understand that. Right. And it's not any magic words. They just need to — I think Justice Alito had a question. Oh, sure. That's all right. Go ahead. Okay. Well, just one last point. They claim that you can harmonize the statute, the two statutes, by reading a tiny exception into the FSIA. And I agree with Justice Jackson that once you start reading that tiny exception in, it will expand. Hamill's tent knows it will be under the tent. But that does not harmonize these two statutes. The rule that's specific can override a general. In this context, it doesn't apply when there's an implied repeal question. Their reading of the statute is that you have a narrow exception, a narrow repeal of the FSIA, and that's still an implied repeal. As this Court said in Home Builders, it doesn't matter whether you call it an exception, an amendment, an implied amendment, it's still an implied repeal. And it contradicts the FSIA. The FSIA Section 1604 says foreign states shall be immune unless one of the exceptions apply. They want to read the statute exactly how, Justice Alito, you didn't allow them to read the statute in Home Builders. Just add another exception. Just add another criteria. It's not in the statute. In 1996, were there instrumentalities of the Cuban government that were engaging in commercial activity in the United States? There definitely were. You don't have to take my word for it. The Undersecretary of State, Peter Tarnoff, testified before the Senate Committee dealing with this exact statute, the Helms-Burton Act, and said in many respects the trade with Cuba is substantial. And he was right. There was $65 million of medicines and medical supplies, not just humanitarian goods, medicines, medical supplies. There were over 20,000 travelers in 1993, 50,000 travelers in 1994. And there were a quarter of a billion dollars, according to Exxon's testimony, exhibits in the District Court of remittances going to Cuban entities in 1994. And as the Court of Appeals held here, those remittances could be the basis of lawsuits under Title III. And I don't think you can fix it to 1995, 1996, in any event, because the statute gives the President the power to expand trade with Cuba. And so whatever the case was in 1995, given that Congress gave the President the power to expand trade, they must have anticipated that trade might be expanded. In fact, in Section 112 of the statute, it explicitly anticipates that the remittance policy will be expanded. Thank you, Counselor. Justice Thomas, anything further? Just so I'm clear, pre-FSIA, could Title III work as it's written? Pre-FSIA? Yeah. It could, because pre-FSIA 1952 to 1976, it could, because there was a restrictive regime of immunity, which wouldn't have rendered Title III suits meaningless. Prior to 1952, it probably meets the court's exception. So this is basically a statutory case. It is clearly a statutory case. You've got to interpret these two statutes harmoniously. Justice Alito? Under Kurtz's language, you either have an express waiver or an implied waiver of sovereign immunity that is, quote, unmistakably clear in the language of the statute. And then what Kurtz says to when there's a cause of action against a government on a claim, it has to be clear enough to effectively, quote, negate a claim Congress has clearly authorized, correct? Mm-hmm. You're relying on the negation question. Correct. And my colleague said, well, doesn't the amount of the negation, how much is enough? And the point is, however, you're saying we don't know how much, but there's a meaningful amount, correct? Correct. This is not 1%. It's not 1%, in any event. It was a hypothetical question. But here, there are hundreds of claims, thousands of claims probably that could be brought. And if you go as far as Petitioner wants, there's hundreds of maybe thousands of claims against foreign governments and foreign entities, correct? Yes. The statute doesn't say claims against Cuban entities. It says any instrumentality of a foreign state. So we could be expanding this even more? Correct. Thank you. You'd be allowing plaintiffs to sue every instrumentality in the world that does any trade with Cuba. Justice Kagan? Justice Gorsuch? Thank you, counsel. Thank you. Rebuttal, Ms. Ratner? Thank you. Four points. First, Justice Alito, to your question about why this practically matters. The first is, yes, there are not significant assets of Cuban instrumentalities in the United States. We have the ability to seek those assets worldwide, which is pretty standard fare in dealing with international judgments. The second is that Exxon is a company that plays the long game. We've had this claim for over 60 years now, and so there may be changes in the future that affect what assets we can recover on. Second point, I hate to complicate the presidential suspension authority further, but I do want to be clear that there are two suspension authorities that are specific to the Cuban government, excuse me, to Cuban instrumentalities. That's 6064A and 6082D. So this can't be dismissed as just potentially suspensions relating to private entities' claims. Third point, I think the food and medicine importer examples really underscore the extreme mismatch here of a Congress that shut down commerce and allowed a few humanitarian examples, food imports, family-oriented remittances, medicine imports. And now, under Respondent's Theory, those are the only hook, those are the only claims that you can bring against Cuban instrumentalities, are the very thing that Congress decided to have a little more solicitude for. I think that creates an incredible mismatch with what they were trying to do here. Finally, I want to underscore we are not asking for this court to have some broad rule that once a sovereign is covered by a cause of action, that's enough. Again, we have pointed to all of these overlapping provisions. This is the express and only defendant called out. There are rules specific to these claims and judgments. There are multiple overlapping suspension authorities, and there are jurisdictional provisions that take this claim out of the FSIA. So that is the sum total, and that is enough for a background statute like the FSIA, just as it would be enough for a background constitutional or common law immunity protection. Thank you. Thank you, counsel. The case is submitted.